UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
```
FISHER SCIENTIFIC COMPANY L.L.C.
and MICROGENICS CORPORATION,

            **Plaintiffs,**

  -against-

ORTHO-CLINICAL DIAGNOSTICS, INC.,

            **Defendant.**

```
------------------------------------------------------------x
```

USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3-29-19

1:18-cv-3088 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

  Plaintiffs Fisher Scientific Company L.L.C. ("Fisher Scientific") and Microgenics Corporation ("Microgenics") (collectively, "Thermo Fisher" or "Plaintiffs") charge Defendant Ortho-Clinical Diagnostics, Inc. ("Ortho") with multiple breaches of contract and seek a declaratory judgment from the Court that Ortho terminated the agreements "without cause," triggering Ortho's obligation to reimburse Thermo Fisher for its expenses. Defendant now moves to dismiss these charges pursuant to Federal Rule 12(b)(6). For the following reasons, Defendant's motion is DENIED.

## BACKGROUND

**I. Factual Background**

  On a motion to dismiss, the allegations in the Complaint are presumed true and all reasonable inferences are construed in plaintiffs' favor. *See Gant v. Wallingford Bd. of*

1

*Educ.,* 69 F.3d 669, 673 (2d Cir. 1995). Moreover, the Court may consider documents attached to the complaint as exhibits or incorporated by reference. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808–810 (2d Cir. 1996). Accordingly, the following facts are presumed true.

### A. The Parties

Thermo Fisher, including Fisher Scientific, manufactures in vitro diagnostic reagents, calibrators, and controls. Complaint ("Compl.") ¶ 8. Microgenics specializes in developing, validating, manufacturing, and supplying drugs for abuse testing ("DAT") and therapeutic drug monitoring ("TDM") assays. *Id.* ¶ 11. Ortho provides in vitro diagnostics to clinical laboratories. *Id.* ¶ 12. One of Ortho's business areas includes clinical assay tests using Ortho's line of VITROS analyzers (the "Ortho Instruments"). *Id.* ¶¶ 13-14.

### B. The Parties' Agreements

In 2014, Ortho issued a Request for Proposal ("RFP") for the manufacture of certain fluids (the "Products") associated with the Ortho Instruments. *Id.* ¶ 15. Ortho then awarded Fisher Scientific the manufacturing project after viewing their bid. *Id.* ¶¶ 16-17. The Parties agreed to bundle the manufacturing contract (the "Supply Agreement") with another project in which Microgenics would validate twelve DAT and TDM assays (the "New DAT/TDM Products") for use with Ortho's Instruments. *Id.* ¶ 18. Following commercialization of the New DAT/TDM Products, Fisher Scientific would manufacture them under the terms of the Supply Agreement. *Id.* ¶ 19.

On October 24, 2016, The Parties signed the Supply Agreement governing Fisher Scientific's manufacture of the Products. *Id.* ¶ 20, Ex. A. The Parties also signed a

Validation Services Agreement (the "VSA," or, together with the Supply Agreement the "Agreements") effective the same day, which governed the terms pursuant to which Microgenics agreed to validate the New DAT/TDM Products. *Id.* ¶ 21. The VSA incorporates several terms of the Supply Agreement, including Section 25.16, which states: "Each Party agrees that, in its respective dealings with the other Party under or in connection with this Agreement, it shall act in good faith." *Id.* ¶¶ 22-23.

Section 3.2(d) of the VSA provides that "Microgenics will complete the Validation Services by December 31, 2017. *Id.* ¶ 31; Ex B. Section 9.4 of the VSA gave Ortho "the right to terminate the VSA if the DAT/TDM assays were not successfully validated by the Validation Completion Date. *Id.*, VSA §9.4. The Supply Agreement also gave the Parties a "cross-termination right," allowing either of them to terminate the Supply Agreement if Ortho terminated the VSA for failure to meet the Validation Completion Date. Ex. A, Supply Agreement §13.4(a). If Ortho terminated the Agreements without cause, Ortho was required to reimburse Thermo Fisher for certain expenses. *Id.* at §13.1.

Section 25.3 of the Supply Agreement also states that, "No Modification, change or amendment to this Agreement shall be effective unless in writing signed by each of the Parties hereto." *See* Ex. A.

### C. Validation Services Delay

The Parties agreed that Microgenics would "validate and document the performance of the New DAT/TDM Products for use with the Ortho Instruments," (the "Validation Services") in accordance with "the performance standards set forth in the Validation Plan." *Id.* ¶ 24; Ex. B § 3.1. This required the Parties to agree to a Validation

3

Plan before Microgenics could perform the Validation Services. The VSA required the Validation Plan be executed by November 15, 2016. *Id.* ¶ 26, Ex. B § 3.2(a).

On October 12, 2016, Microgenics sent Ortho a draft Validation Plan. *Id.* ¶ 25. However, The Parties did not agree to and sign the Validation Plan until June of 2017. *Id.* ¶ 27. The Validation Plan defined the Validation Services so Microgenics could not perform the Validation Services until the Parties agreed to a Validation Plan. The seven-month delay had a significant impact on Microgenics' ability to complete the Validation Services. *Id.* ¶¶ 29-30.

### D. The Parties' Agreement to Extend the Deadlines

The VSA set a December 31, 2017 deadline to complete Validation Services (the "Validation Completion Date"). *Id.* ¶ 31; Ex. B § 3.2(d). As the November 15, 2016 deadline to sign the Validation Plan approached, the Parties accordingly agreed to extend the Validation Completion Date. *Id.* ¶ 32. The Parties first documented this agreement in March of 2017, and repeatedly confirmed it during telephone calls, in-person meetings and in jointly prepared written materials. *Id.* ¶¶ 33-36. The Parties first agreed to extend Validation Completion Date to March of 2018, and, as the Validation Plan continued to be delayed and the scope of the Validation Services debated, the Parties' estimated the Validation Services Completion date should be extended to at least August of 2018. *Id.* ¶¶ 35-37, 44.

The Agreements required the Parties to hold Steering Committee meetings to discuss "any material developments in relation to this [VSA], including but not limited to matters involving the development of the Validation Plan." *Id.* ¶ 38, Ex. A § 10.3, Ex. B. § 5. Additionally, the VSA provides: "Changes or modifications to the validation

protocols, Validation Plan or the Validation Services after the Effective Date will be treated as a material development as contemplated under Section 5 and therefore should be brought to the attention of the Steering Committee." *Id.* ¶ 39, Ex. B § 3.2(e).

As required by the Agreements, The Parties updated the Steering Committee with changes to the project timeline, including the Validation Completion Date extensions. *Id.* ¶¶ 40-43.[1] Ortho management participated in all Steering Committee meetings and never objected to the Validation Completion Date extensions. *Id.* ¶ 45.

### E. Complications with Performing Under the Agreements

Following the executed Validation Plan in June of 2017, Microgenics performed the Validation Services understanding the Parties agreed to extend the Validation Completion date. *Id.* ¶ 46. At the same time, Ortho attempted to expand the scope of the Validation Services beyond the agreement.[2]

The Parties also grappled with a regulatory issue on the Supply Agreement side. Ortho failed to identify the need for an extensive re-registration process in China that would delay performance by a twelve-to-eighteen months and increase manufacturing costs. *Id.* ¶¶ 48-51. Fisher Scientific tried unsuccessfully to work with Ortho to resolve the issue. *Id.* ¶¶ 52-53.

### F. Ortho Terminates the Agreement

Beginning around September of 2017, the Parties held calls every few weeks to

---

[1] For example, The Parties jointly-prepared a written presentation for the October 16, 2017 Steering Committee meeting that estimated that the Validation Services would be completed by August of 2018. *Id.* ¶ 44

[2] For example, Ortho insisting that two of the New DAT Products required "pre-dilution" as opposed to Microgenics' previously disclosed reagent replacement strategy. *Id.* ¶¶ 54, 56, 58. Microgenics believed that Pre-dilution would add months of regulatory delay and increase costs. *Id.* ¶ 57. Microgenics' tests found pre-dilution unnecessary, but Ortho refused to concede. *Id.* ¶ 59.

address the projects' issues. *Id.* ¶ 60. Initially, the parties made progress on the pre-dilution and registration issues. *Id.* ¶ 63. However, as these conversations proceeded, Ortho increased its demands. *Id.* ¶ 64. In late November 2017, Ortho expressed concern about its "stranded costs" associated with the registration issue. *Id.* ¶ 65. In early December, Ortho proposed a launch delay of at least one year of the Supply Agreement, which would pass on the stranded costs to Thermo Fisher. *Id.* ¶¶ 66-67. Ortho also insisted on pre-treatment for at least some of the New DAT/TDM Products and proposed that validation work commence no earlier than November 1, 2019. *Id.* ¶ 68. In the same letter, Ortho asserted for the first time that it had the right to terminate the VSA if Thermo Fisher failed to meet the original December 31, 2017 Validation Completion Date. *Id.* ¶ 69.

On January 2, 2018, after Thermo Fisher rejected Ortho's demands, Ortho sought to terminate the VSA for failure to validate the New DAT/TDM Products by the original Validation Completion Date. *Id.* ¶¶ 70-72; Ex. B § 9.4. Ortho also sought to exercise its cross-termination right to terminate the Supply Agreement. *Id.* ¶ 73, Ex. A § 13.4(a). Thermo Fisher disputed Ortho's basis for termination and sought an expense reimbursement due to Ortho's termination of the Agreements without cause. *Id.* ¶¶ 74-81; Ex. A § 13.1; Schedule F; Ex. B § 9.2. Ortho refused to pay Thermo Fisher's costs, and this litigation ensued. *Id.* ¶ 80.

## II. Procedural History

On April 6, 2018, Plaintiffs filed a Complaint alleging breach of contract (Counts I and II) and seek a declaratory judgment (Count III) for Defendant's early termination of the Agreements. On June 20, 2018, Defendant filed a motion to dismiss. ECF No. 23.

Defendant argues that Plaintiffs' causes of action fail as a matter of law because the Agreements provided Defendant with a right to terminate if the Parties did not meet the December 31, 2017 Validation Deadline. Defendant further argues that the Agreements contain a no-modification clause requiring any modification to be signed by both parties to be binding. Plaintiffs argue that Count I for breach of contract and Count III for declaratory judgment should not be dismissed because no amendment of the Validation Completion Date was required. Plaintiffs also argue that dismissing Counts I and III would be improper due to a valid oral agreement. Lastly, Plaintiffs contend, Count II for breach of contract should not be dismissed because Ortho violated its express and implied obligation to act in good faith in connection with the Agreements.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As previously stated, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in plaintiff's favor. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions."

*Iqbal*, 556 U.S, at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

### I.   Counts I and III: Breach of Contract and Declaratory Judgment

To prevail on a breach of contract claim under New York law, Plaintiff must establish "(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *United States Bank Nat'l Ass'n, v. Dexia Real Estate Capital Markets*, 959 F. Supp. 2d 443, 447 (S.D.N.Y. 2013) (citing *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)).

Plaintiffs claim Ortho breached its obligations and terminated the Agreements without cause, and thus, must reimburse Plaintiffs for their expenses.[3] Termination was allegedly improper because the Parties modified the Validation Completion Date deadline. Compl. ¶¶ 82-87. Ortho argues they terminated the Agreements within their rights since Thermo Fisher did not perform by the original Validation Completion date and, furthermore, the contract specifically bars modifications not written and signed by the parties. ECF No. 25. Plaintiffs argue their complaint should survive a motion to dismiss because: 1) modifications to the Validation Completion Date were not required to be in writing; and 2) the parties' conduct equates to the exception to the New York law barring unsigned modifications.

---

[3] Pursuant to 28 U.S.C. § 2201(a), the Court has jurisdiction to declare the rights of the Parties with respect to the Agreements.

8

### A. Principles Concerning New York Contract Interpretation

New York General Obligations Law § 15 301 prohibits oral modifications to written agreements that expressly require signed modifications.[4] However, courts permit oral modifications under limited circumstances, specifically: "(1) when there has been partial performance of an agreement to modify… or (2) when one party induced the other party to rely on an oral modification such that the first party may be equitably estopped from invoking the writing requirement." *DiStefano v. Maclay,* 102 Fed.Appx. 188, 189 (2d Cir. 2004) (citation omitted). However, the subsequent partial performance or reliance must be "unequivocally referable" to the oral modification. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir. 1990). Therefore, if the alleged partial performance or reliance was merely compatible with the original agreement, the oral agreement will not be enforced. *Id*; *see also Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 122 (2d Cir. 1998).

The "unequivocally referable" requirement has been explained as thus: "[T]he performance must be such as will admit of no other possible explanation except one pointing directly to the existence of the oral agreement claimed." *Bright Radio Labs., Inc. v. Coastal Commercial Corp.*, 4 A.D.2d 491, 494, 166 N.Y.S.2d 906 (1957), aff'd sub nom. *Bright Radio Labs., Inc. v. Costal Commercial Corp.*, 4 N.Y.2d 1021, 177 N.Y.S.2d 526, 152 N.E.2d 543 (1958).

### B. Plaintiffs Properly Allege an Enforceable Oral Modification

---

[4] New York General Obligation Law § 15–301 provides: "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

Ortho correctly points out that Section 25.3 of the Supply Agreement states: "No modification, change or amendment to this Agreement shall be effective unless in writing signed by each of the Parties hereto." Ex. A; Supply Agreement § 25.3. Plaintiffs argue that both parties' conduct show partial performance consistent with an agreement to extend the Validation Completion Date. Ortho did not sign the Validation Plan, a necessary precondition for Mircrogenics to begin Validation Services, until June of 2017. Compl. ¶ 28. This was inconsistent with the November 15, 2016 deadline in the VSA. *Id.* ¶ 32. Ortho acknowledged the fact that the seven-month delay in signing the Validation Plan made it impossible for Thermo Fisher to meet the December 2017 Validation Completion Date. *Id.* ¶¶ 33- 36. Ortho also jointly prepared a written presentation for the October 16, 2017 Steering Committee meeting estimating that the Validation Services would be completed by August of 2018. *Id.* ¶¶ 40-43. Orhto's management never objected to or disputed extending the Validation Completion Date deadline. *Id.* ¶ 44. Moreover, after signing the Validation Plan, Ortho sought to expand the scope of the Validation Services beyond the initial agreement by insisting that two of the New DAT Products required "pre-dilution", a process that would delay completion by months and increase costs. These actions are inconsistent with a Validation Completion Date of December 31, 2017. *Id.* ¶¶ 55-57.

The Court is forced to believe Plaintiff's assertion that the Parties exchanged a series of correspondence discussing and agreeing to extend the Validation Completion Date. *Id.* ¶¶ 33-46. Furthermore, the Parties' partial performance, such as executing a precondition seven months after the deadline and the attempts to expand the scope of the validation protocol, was "unequivocally referable" to the oral modification.

10

Plaintiffs have sufficiently alleged the Parties made a valid agreement to extend the Validation Completion Date deadline. Consequently, the Court can reasonably infer that Defendant's decision to terminate the Agreements before the extended deadline was without cause, and thus, Defendant is required to reimburse Plaintiff's expenses. Therefore, Defendant's motion to dismiss Counts I and III are **DENIED**.

## II.     Count II – Breached Implied Obligations

Under New York law "[t]he implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate [the] occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence." *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015)

Plaintiffs allege Defendants' termination breached their obligation of good faith and fair dealing. Compl. ¶ 89. Defendant maintains that their election for termination was "undeniably" in compliance because they did so before the December 31, 2017 Completion Date. To support their argument, Plaintiffs claim that Defendant's right to terminate under VSA § 9.4 was both a breach of the "good faith" provision in the Agreements and barred by the "doctrine of prevention" because Defendant's conduct "prevented Thermo Fisher from meeting the original Validation Completion Date." Pl.'s Mem. at 18 fn.8; *see also* Compl. ¶ 74. However, Plaintiff's argument in Count II conflates two different claims. The first is that Defendant did not act in good faith in "'in [their] respective dealings . . . under or in connection with" the Agreements. *Id.* ¶ 23. The second is that Defendant "prevented" the condition precedent in various ways.

### A.   The "good faith" Clause

11

Plaintiffs argue that Ortho did not act in good faith "in [their] respective dealings . . . under or in connection with"" by, among other things, impeding their performance of the Validation Services. Pl.'s Mem. at 15; Section 25.16. The Agreement, however, only requires Ortho to act in good faith while performing their obligations. Thus, "[t]he Court rejects this argument to the extent it could be construed as simply alleging another form of breach of contract". *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law… does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled"); *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) (A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.)

## B. The Prevention Doctrine

Plaintiffs also refer to the "prevention doctrine," which is alternatively, "often viewed as a corollary to the implied covenant of good faith." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 498 (2d Cir. 1995); *see also Thor Properties, LLC v. Chetrit Grp. LLC*, 91 A.D.3d 476, 936 N.Y.S.2d 196, 198 (2012) (describing the prevention doctrine as "a variant of the implied covenant of good faith and fair dealing").

The prevention doctrine is the implied obligation not to (1) do anything that will destroy or injure the other party's right to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent. *See Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 212 (2d Cir. 2002); *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 CIV. 0432 (LAP), 2008 WL 650403, at

12

*10 (S.D.N.Y. Mar. 7, 2008). This doctrine is rooted in "notions of common sense and fairness." *Id*; *see also Wieder v. Skala*, 80 N.Y.2d 628, 637, 609 N.E.2d 105, 109, 593 N.Y.S.2d 752 (1992). Parties must not prevent the occurrence of a condition and simultaneously help facilitate the other's performance. *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007 (2d Cir. 1991).

Plaintiffs plead sufficient facts to withstand a motion to dismiss Count II. The Complaint alleges that Ortho failed to agree to a Validation Plan in a timely fashion and decided to terminate the Agreements at the eleventh hour, thus preventing Plaintiffs from performing on the contract. Compl. ¶¶ 27, 32-37, 48-61 & 69-73. Specifically, Plaintiffs allege Ortho prevented their performance by: (a) failing to agree to a Validation Plan until seven months after the contractual deadline for doing so; (b) agreeing to extend the Validation Completion Date and later attempting to revoke that agreement; (c) imposing additional demands outside the scope of the projects and otherwise delaying the projects; (d) remaining silent as plaintiff worked to perform its obligations under the Agreements; and then (e) purporting to invoke plaintiff's failure to meet the original Validation Completion Date as grounds to terminate the Agreements without reimbursement for the costs it incurred. *Id.* These allegations, if true, amount to "frustration," precluding Ortho from exercising its option to terminate. *See Oldcastle Precast, Inc. v. U.S. Fidelity & Guar. Co.*, 458 F. Supp. 2d 131 (S.D.N.Y. 2006) ("A party's failure to perform preparatory work for the other party's performance of the contract can constitute a breach of the implicit obligation not to hinder the other party's performance").

Ortho failed to address Plaintiffs' prevention argument in their reply. Instead, Ortho maintains that the contract permitted their conduct and they had the right to terminate the

Agreements. Def.'s Reply Mem. at 9. Even if the Court accepts that the Parties failed to extend the Validation Completion Date, the point is irrelevant. Generally, courts will respect a contractually permitted right to terminate and refuse to examine a party's decision to exercise that right. However, "[d]efendants cannot exercise permitted conduct if they frustrated Plaintiff's performance." *IXE Banco*, 2008 WL 650403, at *10; *see also Merill Lynch Realty/Carll Burr, Inc. v. Skinner*, 63 N.Y.2d 590, 596-97, 473 N.E.2d 229, 232, 483 N.Y.S.2d 979 (1984). The facts alleged in the Complaint give rise to the plausible inference that Ortho "greatly disrupted" Plaintiffs' performance. *Id.*; *see also, e.g., Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v. Facilities Devel. and Imp. Corp.*, 68 A.D.2d 958, 414 N.Y.S.2d 767 (1979). Therefore, Defendant's motion to dismiss Count II is **DENIED**.

## CONCLUSION

For these reasons, Defendant's motion to dismiss is **DENIED**.

**SO ORDERED.**

Dated: March 29, 2019
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**